of the Attorney General's Office, and David Schleicher, Appellant Plaintiff, Jacqueline Stokes. It might be said that the job of an appellate court is to help people understand the legal rules and then to confirm whether or not they follow them, whether it's a GS-11 operations support specialist helping people with their travel vouchers, coworkers, a federal manager, or a district court judge. And under the Rehabilitation Act, one of those rules is that the federal government should be a model employer when it comes to integrating the disabled into the workforce and not a model of how to thumb its nose at the law. Here, the district court, unfortunately, operated by humans and so capable of the occasional error, has effectively blessed the rule flaunting of several federal front-line federal managers, Mr. Bordone, Ms. Mason, and Mr. Sampson. The court ended up at that error by traveling down three pathways. First of all, the court concluded that a reasonable accommodation is necessary only when it goes to an essential function of a job. What's peculiar about that error is not only that it contradicts Fifth Circuit holding, the Fifth Circuit holding FICE versus Louisiana Department of Justice, but the district court cited that same case multiple times in its decision. So how the district court could cite the case and then skip another part of the case and instead rely on the Seventh Circuit case. Again, we can only chalk up to the fact that humans are writing these decisions and so occasionally we have these errors. Now, the Department of Homeland Security does not seem to dispute that that error occurred. They just urge that it's immaterial. But if you look in the record, the decision at page 1083 where the judge asserts this principle, accommodation is only required when necessary for an essential function of the job, he then immediately in the same sentence goes on to say, therefore, he says, a reasonable trier of fact cannot find that And then in the very next sentence he says, therefore, DHS is entitled to summary judgment. So that was a key basis for the district court judge concluding that Ms. Stokes should lose this case. And so that in itself would be an adequate reason to at least remand. Then there were some smaller errors that were grouped together to achieve a similar harm. One is it brings in a local instructor for employees that DHS surely could not inform that instructor, please give us the materials one day in advance, for example. Because the only accommodation here that is at issue is her request that she get materials for a meeting either one day in advance or in advance so she can look at it on her magnification software or get it at the larger font. Is that material that was handed out at the meeting? There's material that is handed out at some of those meetings and then other times it would be like you have the monitor over here, it might be displayed on the monitor or in a large classroom on the screen. Everyone who was at the meeting, did they have access to the material before or did they get it the day of? Well, sometimes I don't think the material was handed out at all. It's just a PowerPoint presentation. So we're asking. Why the microscope wouldn't work? Right, right. For example, if this, if I was showing something on the screen over here to my right and someone in the courtroom here cannot see it, if they're standing with the magnifying glass between us and the screen, then the rest of us can't see it either. So now if she gets it a day in advance, she has magnification software and she can put it on there and blow it up to 18. That's not something she could transport with her, that magnifying device? Correct. Now, when she's out of town, she had a class in San Antonio and one in D.C. and she acknowledged in deposition when she's out of town, she would go to the So she's, you know, picking her battles and DHS understandably has less ability to control the instructor when it's someone in D.C. and they're in Dallas than they do when they're bringing someone in to their office in Dallas. But the court turned that around to say, well, she told this instructor that, you know, just email me the material, so that must mean she could do that all the time when it's more a matter of she's trying to make the best of a bad situation when she's out of town. Of course, if you have something emailed, you can enlarge it. Right. Right. Correct. Yes. So if she gets the material emailed to her in advance, she can use her magnifying software on her desk. Or she could use her iPad to grow it. Yes. And I'm not sure if she uses an iPad, but yes. Right. Certainly. She could expand it if she receives it electronically. You're correct. She could expand it on the phone. She could get whatever she needs on her own. As I understand it, they argue that since for these out of town things, she doesn't push them to give it to her in advance, then she shouldn't complain about it when it's a local meeting either. But there's certainly a different level of control. Some of these meetings at issue were done by managers in her office. Certainly a different level of control when it's at the office in Dallas versus. So I guess at this point they're relying on the holding that this is too far removed from the core functions of her job or something. Right. The essential function. Well, as I understand the department's position on that, they agree the judge got that wrong, but they're just saying it was not material to his holding. What is material? Well, what is material to his holding is that this is an extremely, I mean if there were some contest for the simplest reasonable accommodation, this would certainly seem to place in the top five, just meeting materials in a larger font or in advance. So that's just the heart of the issue. Did she provide those enlarged documents before she filed suit? Her, so her eyesight over time has gotten worse. So she eventually started bringing this up and then you'll see in the record in April 2014 said I can't see these materials and Ms. Mason responded well we'll, there was some back and forth as there should have been and then Ms. Mason agreed we'll do this for future meetings and then in July 2015 after a suit had been filed, they have another meeting, this time with the disability coordinator and they put in writing we agree from now on we're going to give you these materials, you know, either in advance or in a large font and it still doesn't happen. So she never got the enlarged documents? Correct. It still hasn't. I thought maybe she got them before. So that's part of a prior settlement agreement in the first lawsuit that she filed? So the reference to the settlement agreement and, you know, I'm a little disturbed that a settlement agreement wouldn't end up in the record, but as I understand it the government put that in to say we've done all these other things for her, she had this agreement about getting natural light in her work area so, you know, at some point this is just too much for us. And while there's certainly been managers that did great things like get her the monitors and the magnification software, you know, for these meetings, which I'm sure that her superiors would say are essential meetings, she can't use that software unless they'll give it to her in advance. Is her complaint that she's only being accommodated intermittently? I kind of gathered from the briefs that there were some instances where her requests apparently were not honored. She would remind them that, you know, I do need to get this material either the day before or so on, or that there's no accommodation at all pursuant to the prior agreement. So the prior agreement was about natural lighting. Okay. So she's getting accommodations like the monitors and there's a picture on the record of the monitors at her desk. That's great. But it's this one about the meetings that's the only one at issue here. And Ms. Mason, when Ms. Stokes reminds her by email, I didn't get the meeting materials again. Ms. Stokes responds, I mean Ms. Mason's response is, oh, you know, with an exclamation I believe in the record, in an email. But Ms. Stokes was silent about her request or didn't do enough to engage in the interactive processes is odd given that she goes through the EEO process. She finally files suit in April 2015 and management even after the lawsuit is filed, which I would say is the equivalent of standing on the building with a bullhorn saying, you know, you're not accommodating me. Even after the lawsuit is filed they're still saying, oh, well, we had no idea that, you know, you needed these accommodations. What documentation is she complaining about that she didn't get that would have been supportive of the negative review? So some of these, for example, there is an appropriations law class where they're saying we're bringing in somebody to teach you all some new things about appropriations law that you need for your job. Another one was we're bringing someone in to teach you all about customer service, which they're measured on in their... I don't mean the handling. Oh, sorry. The fact that she was given a bad review and she didn't get her promotion or her pay increase or whatever. It seems like she was saying, well, give me some documentation to support this criticism. Right, okay. What was there that she didn't get? So when Mr. Bordone is there is when she's getting these counseling letters. She's been there like 20 years, not before or after that, but just when he's there. So he decides she's really awful at travel vouchers, something she's done for years and gotten an outstanding rating on before. And so he says, oh, you made an error on this person's voucher, this person's voucher, this person's voucher. And if you look at, I'll get the page here in a second, but if you look in the record at some of those examples where she responded to that, it's in great detail. It's not just, oh, no, I didn't do anything wrong. It's a real attempt to resolve the problem, saying, well, what I remember of that voucher is this happened, this happened, this happened, this happened. So I don't think I was at fault, but please provide the documentation so I can do it. And she never got the documentation, something that the... But she never got the supports. Right. That would have resulted in the voucher. Right, right. So she never got the chance to go back and go over those with Mr. Bordone, and presumably... Did she admit some performance errors? I'm sorry? Did she admit that she had some performance errors? So she did what I would think we would want from an employee, instead of just saying, you know, heck no, I didn't do anything wrong, but to say, you know, it's possible I made some errors. Please give me these documents and please meet with me more often and let's figure out a way to... Presumably a manager that really wants to correct performance or improve operational efficiency is going to show the cards to the employee to say here's what you did wrong with, I don't know, maybe 400 pages of appendix on the government side at the district court. You would think if those were correct at some point. What does she want? So... Motion, money, what are you looking for? So we would like a finding in a published decision that what these three managers did constitutes a failure to accommodate, and so disability reprisal case, so she's described by higher level management as outstanding. We have 13 other staff members who write letters of praise or emails praising her during this performance period when she fails. And we have Mr. Bordone, his credibility being at issue because he's saying he doesn't even know she's blind. It sounds like what you're suggesting is that we not only reverse the granting of the summary judgment in favor of the defendant, but enter a summary judgment in favor of the plaintiff in this case. Yes, so at the district court level we move for summary judgment just on the issue of liability as to reasonable accommodation. We think that one is so clear. And there are, maybe on rebuttal I can go, there are about seven reasons why one might not believe John Bordone. All we have over here is his unsworn assertions that she screwed up on the travel vouchers. And over here, all these employees praising her, higher management praising her, a previous record of outstanding performance. You know, a jury certainly could believe either one, but we believe that's enough to at least raise a fact issue about pretext that a jury should be allowed to decide it. She still works there? She does still work there, and she does not report to Mr. Bordone or Mr. Sampson. And so she's not getting letters of counseling, but the non-accommodation continues. She's not getting letters of counseling, but the non-accommodation continues. Thank you, sir. Ms. Haslund? Yes. Thank you. May it please the Court. I'd like to first address the failure to accommodate claim, which boils down to four meetings, two of which Ms. Stokes is not clear whether there were or cannot recall whether there were any materials that were actually distributed at the meeting. The other two meetings were conducted by contractors, not by the agency itself, and Ms. Stokes testified that there were books that were distributed at those meetings and didn't deny that she could use the handheld magnifier that the agency provided to her to read those books. To the extent Ms. Stokes had a problem understanding the content, the agency would ask that she let them know, and her supervisor had made clear that it was important that she take the lead and let them know what she needed for any particular meeting, and certainly if there was a problem when she got to a meeting, to let them know if there was any adjustment that could be made. And the agency had, for example, with respect to a meeting on April 15, 2014, provided materials in advance to Ms. Stokes as well as to all the other attendees of the meeting, and this was directly in response to a direct instruction that Ms. Stokes' supervisor had given to her assistant after Ms. Stokes had made the request to receive materials at that point in the large font. Her supervisor specifically instructed her assistant to provide materials in advance to Ms. Stokes, but really to everyone, and then her assistant went ahead and did that. And with respect to these four meetings, Ms. Stokes, although there was an instruction, her supervisor, this is at page 606 of the record, asked her to take the lead, to let her know what she needed for any precise meeting. This was in August of 2014, so this instruction preceded each of the four meetings at issue. But with respect to each of those meetings, Ms. Stokes didn't give any, didn't follow up. And so with respect to the September 17, 2014 meeting, that's found in the record at 857 to 58. The August 12, 2015 meeting, that's at 1,031. Early August 2015 meeting, that's at 867, 778, and 79. And then with respect to the fourth of those meetings, August 18, 2015, that's at 871 to 72, where she admits that she didn't follow up, she didn't give specific instruction. As for the argument about Judge Fitzwater's citation to the Brumfield decision from the Seventh Circuit, as counsel mentioned, the government's position is that his citation to that case was not material. Although there is a juxtaposition physically as far as the sentence is, it was not relevant to his finding that the judge makes clear that the reason he found there was no jury could find a failure to accommodate here was based on two reasons. And the first was that Ms. Stokes had other ways, she admits that she has other ways in which she could understand meetings. She could understand them by listening, by going to the instructor. And secondly, Judge Fitzwater found that she didn't appropriately engage in the interactive process and she didn't, she didn't appropriately give her supervisors enough information about what she needed. Or weren't there e-mails saying what she needed to the supervisors? There were not. With respect to the four meetings at issue, there were no specific, there were no specific instructions. There were no e-mails saying that she needed these accommodations. There was a general instruction. So in April of 2014, she makes a general request for materials in large font. And her supervisor responded, I think that same day, saying that the supervisor would, to the extent she could, provide meetings in advance. Why isn't that interacting? Well, it is, and certainly the government's position is not that Ms. Stokes would be required, you know, to restate the same instruction for every single meeting. However, as part of that interaction in August 2014 at page 606, her supervisor says that she expected her to take the lead and do give a heads up with respect to those meetings. What does that mean? Well, that, that she not stay silent. That, that even if they, if the agency had inadvertently not given her materials in advance, that she say something. And that she, you know, even if the meeting had begun and it wasn't meeting her needs, that Ms. Stokes say something, and they certainly were trying to work with her. You know, they had But didn't they know that they didn't give the enlarged documents? Well, as I mentioned, with respect to these four meetings, it's not clear for, with respect to two of them, that there were any materials. Ms. Stokes could not recall any. And the other two, she says that there were books that were distributed. And so that would lend itself to Ms. Stokes using her magnifier in order to understand the content of the books. So why would that result in a failure to interact? What does that mean? I know I just asked you that, but I don't think you answered the question. There may not have even been a need to interact because there weren't materials at issue that had been established. So what was Ms. Stokes' sort of thinking? As far as his reference to the Brumfield? What did you all argue to make him say she didn't interact? Well, that case was not cited in either of the briefs. I think it may have. There was a reference. Because the government concedes that Ms. Stokes is a qualified individual with a disability, and the test for meeting that is that the individual is able to perform the essential functions of the job with or without an accommodation. So I think that that may have perhaps led to that, led to the citation and the decision about essential functions. But it is not. But the decision doesn't seem to rest on that. I mean, Judge Fitzwater reasons that there wasn't a failure to accommodate for the two reasons I mentioned earlier. Right. But one of them was you said other ways to understand the materials, and then you said she didn't interact. So I don't understand what evidence or what allegations he was referring to. And as you well know, the Court can affirm on any ground, and if the Court finds that that was not justified, a justified basis for on the failure to accommodate claim, then it can affirm on any ground. If it finds, for instance, the other justification was valid, that she was able to understand the meetings through other means. Now, turning to the retaliation claim, unless there are further questions on failure to accommodate, here the timing is kind of backwards. The alleged actions took place, or sort of the buildup to these actions took place before there was any EEO activity with respect to the supervisors at issue for those events. Now, Mr. Bourdon, as was discussed, he was a new supervisor for her. She had not previously received an unacceptable rating, but Mr. Bourdon was a new supervisor, and under his guidance, she, for the first time, received unacceptable. He was known in the agency as being very careful. What types of things did he point to to declare her performance unacceptable? She had been there a while. Correct. She's been with the agency for almost 20 years. Right, right. Yes. So what were the things that he identified that made her performance subpar? Well, he was very specific. His — the letters are very specific and detailed, and he issued her three letters in advance of the unacceptable rating. The first one dealt with instances of unprofessional conduct. The second one dealt with instances where she made errors on travel vouchers. That was her job responsibility. She agreed that she had made some errors in the past. Is that correct? At least she doesn't deny that she had made the errors. Okay. And then the third? The third error was, I think, eight instances of technical mistakes, and these are — I can provide the citations, but these are detailed, contemporaneous documentation of the errors that she had made. Now, there's — at page 626 of the record, there's an email from Mr. Bordone to his supervisor letting his supervisor know that he had completed writing — he had completed writing the first counseling letter for Ms. Stokes. That was on May 16th of 2015. Now, Ms. Stokes doesn't contact an EEO counselor with reference to Mr. Bordone until May 21st, 2015, following this email where it's clear that Mr. Bordone is initiating these letters of counseling, which all lead up to the unacceptable rating. And that EEO contact is at pages 680 to 84 of the record. And now, with respect to the other supervisor, Ms. Mason, again, the timing is reversed for what it would need to be for a proper retaliation claim. And this is the allegation that Ms. Mason failed to submit paperwork in support of a promotion. Well, that incident, or alleged incident, occurred in November of 2014, and that's in a letter that the agency actually does not have a record of, but assuming that that is an authentic letter. That letter is from November 2014, and that's at page 1044 in the record. Ms. Mason was not named in any EEO activity until July 2015, and that's at page 674. You mentioned Mr. Bordone's first comment about her unprofessional behavior. Of what nature is that unprofessional appearance at work? I mean, she's been there, like you said, for 20 years, and now she's being written up for behavior that he declares to be unprofessional. Is it her attire, her interaction with others in the workplace, or her performance, or her treatment of third parties that she would come into contact with that were non-employees? I mean, why all of a sudden, other than his perfection and his desire to whatever, raise her performance, what specifically is he complaining about that is unprofessional about her conduct in the workplace? Okay, so I don't make a mistake. I'm looking at the record here at page 429, which is actually part of the district court summary judgment briefing, the brief that I prepared. This is the first, as you say, the first of the letters that Mr. Bordone issued. He found that on one occasion, Ms. Stokes had threatened him, Mr. Bordone, with the words that she would, quote, let it slide this time, unquote, when Mr. Bordone allegedly did not provide Ms. Stokes with an electronic copy of a form before a meeting that he had held. So that was the first instance. The second instance was that he alleged Ms. Stokes told Mr. Bordone again that she would, quote, let it slide this time, unquote. Is that after the prior agreement? It is. The first incident was April 2015. The second one was May 2015. So that's after the government had agreed in connection with the prior action. With the accommodation? Yes, yes. Correct. So the second instance was another occasion in which she allegedly said, quote, let it slide this time, when Mr. Bordone forwarded an e-mail message that Ms. Stokes had sent to Mr. Bordone requesting light bulbs. Requesting what? She had requested light bulbs. Ms. Stokes had made a request to Mr. Bordone for light bulbs, and I believe Mr. Bordone had forwarded her request to the reasonable accommodations coordinator. And according to Mr. Bordone's letter, Ms. Stokes, in response to Mr. Bordone's forwarding her e-mail, told Mr. Bordone that she would let it slide this time. The third let it slide this time? It was the second one, at least as far as the occasions that are referenced in this letter. That's unprofessional? Unprofessional. And there's a final instance that's documented in that letter as well. And this, like the second one, occurred in May of 2015. What do you think she meant by that, or do we know? I think from my recollection of depositions and so forth, I think her intent was that she wouldn't file an EEO complaint about it or take that kind of action at this time. She would let it slide and not. That's unprofessional. If you think you have an OEOC claim and you say, I'm going to file it this time. Let me tell you about the third one. Is that okay? Okay. And then maybe that will rise to the level that you would expect. So the third instance that's documented in that letter, Ms. Stokes went to Mr. Bordone's office, this is quoting from the letter, to claim adamantly that he, Mr. Bordone, should not have sent the email related to light bulbs to others. And I think there's a suggestion there about the tone in which she perhaps said that, at least in Mr. Bordone's opinion, was unprofessional. She was complaining about copies of the email going to other persons. Right. And if you look at the subsequent two letters that Mr. Bordone issued, those I think you would agree would be more objective, where he actually documents errors that were made in travel vouchers and technical mistakes that were made, if that's of any help. But she asked for documentation of those errors, and that documentation wasn't produced. Why? The documentation that the agency had was the detailed documentation that Mr. Bordone made at the time of the events in question. No, the documentation that would support the allegation that there were errors in the voucher or, in other words, what documents were reviewed or relied upon to create the voucher. She wanted the documentation, I thought, and it wasn't produced. It was not produced. The agency for — it was not. It was not. However, I believe that Ms. Stokes, through other means, could have rebutted the — well, first of all, she doesn't deny that she made mistakes. And in addition, I believe she could have used witnesses, employed witness testimony to rebut some of these examples, because many of them pertained to third parties where she had made errors in processing someone's voucher, which had caused delay. Did they show her the vouchers? Did they say, look, these are the vouchers and these are errors? I think that she had access to the system. She was a traveler. That was her job, was helping people move. Right. Did she know what the — obviously, she didn't know what the errors were until they alleged these are erroneous entries or something. So was she provided the document? I thought the allegation was that they didn't provide the supports. Right. Beyond the detailed summaries in the letter, she was not provided additional documentation that I'm aware of. However, I think that she herself, because of her access to the travel system, would be able to rebut the allegation that there were errors. In addition, as I mentioned, she could have employed witnesses to testify in her favor if that was the case, that, in fact, there had not been any problems with her processing their travel requests. So, in summary, the district court's judgment was correct with respect to both the failure to accommodate claim and the retaliation claim. Unless there are further questions, the government would rest on its brief and ask that the judgment of the district court be affirmed. Thank you. Thank you very much. Mr. Swire, you have five minutes on the roll. Thank you. The suggestion that Ms. Stokes could somehow go into the system and get the backup documentation is speculation that's outside of the record. The suggestion that she could call witnesses to say whether or not there were errors. These travelers, these staff members at Homeland Security in Dallas, they don't understand the travel system. That's why they go to Ms. Stokes, because they don't know what's going wrong, why their vouchers are being rejected. So they can't be called to the stand and testify about what went wrong with those things. She's the expert on those systems. If you'll take a look in the record, 669 to 673 is one of her letters. 716 to 720 is another where she goes in detail with the knowledge she has to try to rebut those, but doesn't have the actual documents. This claim that the government somehow was unaware is puzzling. We have the April 2014 email response from Ms. Mason. She says, quote, We will ensure you have ample time to review the electronic document with your magnification software. Then in August 2014, Ms. Stokes did, I think in this meeting, get some. She said, that's the sort of accommodation I have in mind for this in future meetings. This is back in 2014. Then in September 2014, Ms. Stokes to Ms. Mason says, I didn't get these again. Ms. Mason responds, oh. July 2015, Ms. Stokes to Mr. Bourdon, I'm legally blind in one eye, she says in a memo. And he later says, oh, he didn't realize that she had these vision problems. She said in that memo also she wanted the materials in a larger font or in advance of a meeting. And here, I think this captures a lot. Mr. Bourdon in November 2015 emailed to Ms. Mason. He's talking about giving Ms. Stokes her annual rating. He comments, I'll probably have to read to her everything on it. So he knows she's got a vision problem. He thinks apparently that it's funny or a burden to him. In November 2015 memo from Ms. Stokes to Mr. Bourdon expressing alarm, you continue to act as if I'm faking being legally blind in one eye. Now, let it slide. If I'm pulled over apparently allegedly speeding on Canal Street and the police officer says let it slide, I don't file a complaint that he's unprofessional. I'm grateful. So I'm not sure I understand how let it slide is. I misunderstood. I thought she was saying she said let it fly. Let it fly. Well, she said let it fly. Maybe that would be. Let it slide. Let it slide is what he claims she said. So she's trying to politely remind him I have these reasonable accommodations and you haven't provided it, but I'm going to let it slide. Like please do it next time. To suggest Mr. Bourdon is not aware of her EEO activity, she's got the lawsuit pending. I would think that surely management is informed that an employee has a lawsuit pending about a reasonable accommodation. And she says in this memo in July to him she expresses regret that she's going to have to name him as a responsible management official talking about I thought when you came in we were going to have a fresh start, but I see now you've gotten dragged into all this. So he knows as of that time that he individually is likely to be named. So Congress has made the decision that if an employee would rather stay in the workforce than sit at home and perhaps receive a check but not have the dignity that a job provides, that employers should do that, and particularly for the government where it's supposed to be a model employer. So Ms. Stokes has expressed interest in fully participating in the workforce. So the outcome of your decision is either going to be to bless or to condemn the actions of these three managers in attempting and not bothering to care what Congress has directed take place. Anything else? Thank you very much. That concludes our oral arguments for this panel. We'll take the cases argued and those unargued under advisement.